IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 1:18-cr-69 |
| | : | |
| v. | : | (Judge Jones) |
| | : | |
| JERRELL TATE | : | |
| Defendant. | : | Electronically filed |

## UNITED STATES' SENTENCING MEMORANDUM

Defendant Jerrell Tate pleaded guilty to possession with intent to distribute heroin and fentanyl, in violation of 21 U.S.C. § 841(a)(1). The probation office determined that Tate is a career offender and calculated a guideline range of 188 to 235 months. PSR ¶¶ 20, 54. There are no outstanding objections to the PSR. Based on the seriousness of Tate's present offense and the nature and circumstances of his criminal history, the Court should impose a sentence within the guideline range.

**I.  There is a crisis regarding opioid and heroin use and availability in the Middle District of Pennsylvania and nationwide.**

Approximately 142 Americans die each day from a drug overdose. This death toll is equal to the death toll of September 11, 2001, every three weeks. The presence of an opioid was identified in 85% of drug-

related overdose deaths in Pennsylvania in 2016. This opioid crisis in Pennsylvania and across the United States is a public health and safety emergency. Indeed, on October 26, 2017, the President declared the opioid crisis to be a national public health emergency.

On June 27, 2016, the U.S. Drug Enforcement Administration ("DEA") issued its 2016 National Heroin Threat Assessment.[1] According to the DEA, heroin use and availability are on the rise and causing more overdose deaths than at any time in the last decade. The assessment explains that in 2014, 10,574 Americans died from heroin-related overdoses, more than tripling the number in 2010. Drug overdose is now the leading cause of injury and death in the United States, surpassing car crashes and gun violence.

The Centers for Disease Control and Prevention ("CDC") views the sharp rise in heroin-related overdoses as an epidemic.[2] The CDC states that heroin use has increased across the United States among men and women, most age groups, and all income levels. As heroin use has

---

[1] https://www.dea.gov/divisions/hq/2016/hq062716_attach.pdf.
[2] http://www.cdc.gov/drugoverdose/opioids/heroin.html.

increased, so have heroin-related overdose deaths. The CDC reports that between 2000 and 2015, the rate of heroin-related overdose deaths more than quadrupled, and more than 12,989 people died in 2015.[3]

Sadly, today's heroin epidemic has hit home in the Middle District of Pennsylvania. The Pennsylvania State Coroner's Association issued a report on drug-related overdose death statistics for 2015, which breaks down drug-related overdose deaths by county.[4] A review of that report is a grim reminder that drug-related overdoses, including heroin-related drug overdoses, are prevalent throughout the Middle District of Pennsylvania. According to the Pennsylvania State Coroner's Association Report on Overdose Death Statistics for 2015, statewide opioid overdoses due to fentanyl far exceed those of any other opioid medication, amounting to some 34% of such cases.

---

[3] *Id.*
[4] The Pennsylvania State Coroner's Association Report on Overdose Death Statistics for 2015 can be found at http://www.pacoroners.org/Uploads/Pennsylvania_State_Coroners_Association_Drug_Report_2015.pdf. The report includes statistics for all drug-related overdose deaths and is not restricted to heroin-related overdose deaths. It is likely that not all drug-related deaths were reported to the coroner, and the report does not include overdoses that resulted in serious mental and physical injuries.

3

Drug-related deaths are continuing to increase. The DEA Analysis of Overdose Deaths in Pennsylvania for 2016 (issued July 2017) indicates that coroners and medical examiners in Pennsylvania reported 4,642 drug-related overdose deaths in 2016, almost doubling the number reached in 2014 (2,489).[5] This means that in 2016 approximately 13 people died every day in Pennsylvania from drug-related causes. Opioids were identified in 85% of the total deaths reported.

This overwhelming and steady increase is alarming. The year 2014 showed an average increase of about 20% over the prior year for many counties. In 2015, the number of drug-related deaths increased to 3,505, which represents a 30% increase over the prior year. The number increased 37% from 2015 to 2016. If, initial data for 2017 is any indication, the number of deaths will continue to increase.

Almost as alarming is the number of individuals who overdosed, but were fortunate enough to be saved by fast-acting antidotes. For every overdose death, there are scores of individuals living with

---

[5] https://www.dea.gov/docs/DEA-PHL-DIR-034-17%20Analysis%20of%20Overdose%20Deaths%20in%20Pennsylvania%202016.pdf.

addiction and committing crimes to support their habits. Crime increases when addicts deplete their savings and bargain away their possessions to support their habit. In addition to the overdoses, the economic and social costs to the community are overwhelming. Heroin and other opioids tear apart families, and the community is left to support loved ones left behind.

This Court should consider these statistics and the havoc that heroin and other opioids, including fentanyl, are wreaking in our community when it imposes its sentence in this case. One dose of heroin, which sells on the street for approximately $5 to $15, contains on average about .025 grams of heroin. That individual dose can be fatal, depending on its purity. To trigger a five-year mandatory minimum sentence, at least 100 grams of heroin must be involved in the offense, or in other words, approximately 4,000 doses of potentially fatal heroin. *See* 21 U.S.C. § 841(b)(1)(B)(i). For a ten-year mandatory minimum sentence to apply, at least one kilogram of heroin must be involved in the offense, or in other words, approximately 40,000 doses of potentially fatal heroin. *See* 21 U.S.C. § 841(b)(1)(A)(i).

As lethal as heroin is, fentanyl, a synthetic opioid, is 50 to 100 times more powerful than morphine and up to 50 times more potent than heroin. In its purest form, fentanyl is a white powder or in grains similar in size to grains of salt. It only takes a very small amount of fentanyl to cause a severe or potentially deadly reaction. As little as two milligrams is a lethal dosage in most people. Consequently, the drug presents a significant danger not only to users, but also to others who might encounter it, such as first responders and law enforcement officials.

Fentanyl is approved by the Food and Drug Administration for limited use as an analgesic and anesthetic, and is considered a Schedule II narcotic under the Controlled Substances Act. As of February 6, 2018, the DEA issued a temporary placement of not otherwise scheduled fentanyl-related substances in Schedule I of the Controlled Substances Act. Federal Register Volume 83, Number 25, pp. 5188-5192 (citing 21 C.F.R. Part 1308). In doing so, the DEA noted:

> "[i]t is well known that deaths associated with the abuse of substances structurally related to fentanyl in the United States are on the rise and have already reached alarming levels. While a number of factors appear to be contributing to this public health crisis, chief among the causes is the

> sharp increase in recent years in the availability of illicitly produced, potent substances structurally related to fentanyl. Fentanyl is approximately 100 times more potent than morphine, and the substances structurally related to fentanyl that DEA is temporarily controlling also tend to be potent substances. Typically, these substances are manufactured outside the United States by clandestine manufacturers and then smuggled into the United States. Fentanyl is often mixed with heroin and other substances (such as cocaine and methamphetamine) or used in counterfeit pharmaceutical prescription drugs. As a consequence, users who buy these substances on the illicit market are often unaware of the specific substance they are actually consuming and the associated risk. According to the Centers for Disease Control and Prevention (CDC), drug overdose deaths involving synthetic opioids (excluding methadone), such as fentanyl and tramadol, increased from 5,544 in 2014 to 9,580 in 2015. According to provisional data released in August 2017 by the CDC, National Center for Health Statistics, an estimated 55 Americans are dying every day from overdoses of synthetic opioids (excluding methadone). Drug overdose deaths involving synthetic opioids excluding methadone for the 12-month period ending in January of 2017 (20,145 deaths) more than doubled from the corresponding data for the period ending in January of 2016 (9,945 deaths).

*Id*.

Heroin is often laced with fentanyl by drug dealers in order to improve the potency of the drugs they sell. A drug dealer's measuring equipment and methods are not as fine-tuned or as accurate as those used for commercially produced pharmaceuticals, thus their drug

customers are placed at risk of receiving lethal doses of fentanyl. Furthermore, since heroin and fentanyl are similar in appearance, the drug addict may inadvertently overdose on the laced product by taking his normal dose of what he believes is pure "heroin."

One of the main reasons for the rapid spread of fentanyl is that it offers a high profit margin for traffickers. For example, traffickers can typically purchase a kilogram of fentanyl powder for a few thousand dollars from a Chinese supplier, transform it into hundreds of thousands of pills, and sell the counterfeit pills for millions of dollars in profit. If a particular batch has two milligrams of fentanyl per pill, approximately 500,000 counterfeit pills can be manufactured from one kilogram of pure fentanyl. According to DEA reporting, these pills containing fentanyl or fentanyl-related compounds are being sold at retail at prices between $10 and $20 per pill in the U.S. illegal drug markets (depending on the purity of the fentanyl and the dosage).

To trigger a five-year mandatory minimum sentence, at least 40 grams of fentanyl must be involved in the offense, or in other words, approximately 20,000 doses of potentially fatal fentanyl. *See* 21 U.S.C. § 841(b)(1)(B)(vi). For a ten-year mandatory minimum sentence to

apply, at least 400 grams of fentanyl must be involved in the offense, or in other words, approximately 200,000 doses of potentially fatal fentanyl. *See* 21 U.S.C. § 841(b)(1)(A)(vi).

As calculated in the presentence report, Tate is responsible for approximately 20 grams of a mixture or substance containing a fentanyl analogue—a significant amount of a potentially fatal drug. By any definition, this is a very serious offense, and the sentence this Court imposes should reflect the seriousness of the offense. *See* 18 U.S.C. § 3553(a)(2)(A).

## II. Additional sentencing factors under 18 U.S.C. § 3553(a) support a sentence within the guideline range.

Based on Tate's career offender status, the PSR calculated a guideline range of 188 to 235 months. PSR ¶ 54. In addition to the serious nature of Tate's offense, other factors also support a sentence within that range:

- Tate has had contact with the criminal justice system from a relatively young age. PSR ¶ 24.

- Tate's contact with the criminal justice system, moreover, has been nearly continuous. After his first adult drug-

9

trafficking conviction, he was sentenced 36 to 72 months. PSR ¶ 26. He was paroled in August 2013 and was arrested for a new drug-trafficking charge in March 2014. PSR ¶¶ 26-27. And he committed the present offense while on supervision. PSR ¶ 29.

- Unlike some defendants who appear before the Court, Tate does not appear to have a significant substance abuse problem. PSR ¶ 43. Although he attempts to cast himself "as an addict who sells to support a habit," Doc. 56, at 9, he told the probation office that "he used heroin approximately ten times in" in 2017. PSR ¶ 43. Additionally, Tate has two prior convictions involving the distribution of crack cocaine, and he does not suggest that he has ever abused that drug. PSR ¶¶ 26-27.

- This offense—as well as one of Tate's prior drug-trafficking offenses—involved a firearm. PSR ¶¶ 8, 26.

Based on these facts, a sentence within the guideline range is appropriate.

## CONCLUSION

The Court should impose a sentence within the guideline range of 188 to 235 months.

Dated: May 6, 2019

Respectfully submitted,

DAVID J. FREED
United States Attorney

/s/ Carlo D. Marchioli
Carlo D. Marchioli
Assistant U.S. Attorney
PA 309217
228 Walnut Street, Suite 220
P.O. Box 11754
Harrisburg, PA 17108
Tel: (717) 221-4482
Fax: (717) 221-4493
carlo.d.marchioli@usdoj.gov

# **CERTIFICATE OF SERVICE**

I certify that on May 6, 2019, I served the foregoing document by electronic service on the following individual:

Jonathan White, Esquire
jwhite@dplglaw.com

/s/ Carlo D. Marchioli
Carlo D. Marchioli
Assistant U.S. Attorney